IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FREDERICK WILLIAMS,

        Plaintiff,

    v.

ATC GROUP SERVICES, INC. d/b/a
ATC ASSOCIATES, INC.,

        Defendant.

CIVIL ACTION FILE NO.

1:05-CV-2481-JFK

## <u>ORDER AND WRITTEN OPINION</u>

Plaintiff Frederick Williams filed his complaint in this case against Defendant ATC Group Services, Inc. ("ATC"), on September 23, 2005. [Doc. 1]. Plaintiff alleges that Defendant retaliated against him and discriminated against him on the basis of his race in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, <u>et seq.</u> In addition to his federal claims, Plaintiff Williams asserts state law claims of intentional infliction of emotional distress and negligent hiring, training, retention and supervision. [<u>Id.</u>]. Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, Defendant ATC has filed a motion for summary judgment [Doc. 49] on Plaintiff's claims.

**I.      Facts**

When evaluating the merits of a motion for summary judgment, the court must view the evidence and factual inferences in a light most favorable to the non-moving party.  See Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987).  However, unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment.  See Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 714 (11th Cir. 1984).  Therefore, the evidence presented by the parties having been evaluated in accordance with the foregoing principles, the following facts are deemed to be true for the limited purpose of evaluating Defendant's motion [Doc. 49] for summary judgment.

Plaintiff Frederick Williams is African American and a Christian.  [Plaintiff's Statement of Material Facts ("PSMF") ¶ 1].  In 1988, Plaintiff Williams became employed by ATE Associates, Inc. ("ATEC"), where Alex Goharioon was his supervisor.  While at ATEC, Plaintiff worked mostly as a field technician outside of the office.  [PSMF ¶ 2].  In 1991, Plaintiff went to work for McDonnell Douglas Services and was relocated to Saudi Arabia, where he lived for five years and worked as a Level III Non-Destructive Testing ("NDT") Inspector.  [PSMF ¶ 3].  When violence increased in the Middle East, Plaintiff left Saudi Arabia and returned to the

2

United States to begin working for Applied Technical Services as the Aviation Supervisor for NDT.  [PSMF ¶ 4].

In 2000, Plaintiff contacted Goharioon, ATC's Atlanta Branch Manager and Plaintiff's former boss, about coming back to ATC and helping the company start an aircraft inspection division.  [Defendant's Statement of Material Facts ("DSMF") ¶ 3]. Based on Plaintiff's aircraft inspection proposal and extensive experience doing non-destructive testing, Goharioon, who is Iranian American and a Shiite Muslim, offered Plaintiff a job in ATC's Structural Steel Inspection Group.  [DSMF ¶ 4].  On November 18, 2000, Plaintiff left Applied Technical Services and began working for Defendant ATC as a Level III NDE[1] Inspector[2] in the Structural Steel Inspection Group.  [PSMF ¶ 5; DSMF ¶ 1; Pla. Dep., Ex. 1].  Plaintiff's starting salary was $26.00 per hour, and his supervisor was Goharioon.  [PSMF ¶ 6].

---

[1]Plaintiff testified that NDT was often used interchangeably with NDE, which stands for "non-destructive evaluation" or "non-destructive engineer."  [Plaintiff's Deposition ("Pla. Dep.") at 23-24].

[2]Goharioon testified that a Level III NDT Technician or Inspector is someone with years of experience in non-destructive testing and a Certified Welding Inspector that holds other certifications.  [Goharioon Dep. at 33; PSMF ¶ 17].  Plaintiff was one of two of Defendant's employees that were Level III NDT Certified.  [PSMF ¶ 18].

3

When Plaintiff Williams started at ATC, he asked Goharioon to purchase some equipment in order to start the aircraft inspection division and to construct a laboratory in which the equipment could be stored and used.  [DSMF ¶ 5].  Goharioon testified, "There was no [aviation] group until [Plaintiff] joined us.  We didn't have anything in aviation.  He gave us a business plan, saying that this business will work.  And since I trusted him and have worked with him before and he said the company that he was coming from, that's what he did so he could bring clients and business."  [Goharioon Dep. at 48].  Goharioon authorized around $75,000 in expenses in order to purchase the desired equipment and to construct the laboratory.  [DSMF ¶ 6].

Goharioon assigned Plaintiff Williams his own cubicle, and Plaintiff was the only employee in the Structural Steel Inspection Group to have one.  [DSMF ¶ 7].  Plaintiff later asked Goharioon to move him to an office with a door, but this request was denied.  [PSMF ¶ 27].  Goharioon stated in his declaration that he did not give Plaintiff his own office because he was often out of the ATC office, had his own cubicle, and also had access to the laboratory, which was rarely used.  [DSMF ¶ 8; Goharioon Declaration ("Dec.") ¶ 19].

In addition to starting the aircraft division, Plaintiff was hired to inspect structural steel.  [DSMF ¶ 9].  Goharioon testified that Plaintiff was also hired to help

4

ATC with "certifying our employees and helping me out, I guess, to put our arms around all these career paths and certifications that we had from different groups and all that." [Goharioon Dep. at 136]. Sometime after starting his employment with Defendant, Plaintiff Williams became the supervisor of the Structural Steel Inspection Group. [PSMF ¶ 10]. Goharioon himself considered Plaintiff the head of the Structural Steel Inspection Group, which the parties also refer to as the NDT Department. [PSMF ¶ 12]. The company printed business cards for Plaintiff with the title NDT Manager. [PSMF ¶ 14]. At the time, the Structural Steel Inspection Group included Chuck Raby, Buddy McGarrett, Shane LaPann and Bill Thomas, all of whom are white. [DSMF ¶ 10; PSMF ¶ 9]. During Plaintiff's employment, Goharioon hired Charles Holloway (African American), Gordon Livermore (white), Ben Rankin (African American) and Yousuf Kahn (Pakistani American), all of whom had been referred to ATC by Plaintiff. [DSMF ¶ 12].

Goharioon stated in his declaration that even after Plaintiff began supervising the Structural Steel Inspection Group, Goharioon continued supervising one of the Structural Steel Inspection Group's employees, Bill Thomas.[3] Goharioon believed

---

[3]Plaintiff notes that Goharioon also retained supervisor authority over George Harrison, who is white, but it does not appear that Harrison was in the Structural Steel Inspection Group. [PSMF ¶¶ 9, 15; Goharioon Dep. at 132-33].

5

Thomas wanted to continue reporting to him given his years with ATC, his experience level, and his having told Goharioon that he liked working for him.  [DSMF ¶ 11; Goharioon Dec. ¶ 15].

As noted above, Plaintiff Williams referred Yousuf Kahn for the position of NDE Engineer.  [DSMF ¶ 13].  Kahn did not have a Level III NDT Certification when he started working for Defendant.  [PSMF ¶ 19].  Kahn interviewed with ATC in February or March 2001 and based on Plaintiff's endorsement and Kahn's education, experience and interview, Goharioon wanted to hire him.  [DSMF ¶ 14].  However, before accepting the position, Kahn asked for two things: to be paid $28.00 per hour and to be supervised by Goharioon.  [DSMF ¶ 15].  Regarding Khan's pay rate, Goharioon believed $28.00 per hour to be too high, but he told Kahn that he would start him at $25.00 per hour and give him a $3.00 per hour raise if Kahn obtained his Certified Welding Inspector certificate. [DSMF ¶ 16].  Goharioon agreed to supervise Kahn, but Plaintiff continued to supervise the other members of the Structural Steel Inspection Group.  [DSMF ¶ 17; PSMF ¶ 16].  Khan regularly performed field structural steel inspections like the other members of the Structural Steel Inspection Group.  [PSMF ¶ 23].

AO 72A

(Rev.8/82)

While Goharioon deferred to Plaintiff on most matters, Goharioon did confer with Plaintiff when issues related to the Structural Steel Inspection Group arose, such as client complaints and staffing questions. [DSMF ¶ 18]. Sometimes they disagreed on how these issues should be handled, but, because Goharioon was ultimately responsible for the branch, he had to make decisions he thought best for the company. [DSMF ¶ 19].

When Plaintiff Williams started at ATC, he received $26.00 per hour, $3.00 per hour more than he had at his former employer. His pay increased to $27.04 on January 5, 2002, to $27.85 on June 7, 2003, and to $28.69 on June 5, 2004. [DSMF ¶ 20]. Except for Kahn, who received his $3.00 per hour raise after completing his certification, Plaintiff was the Structural Steel Inspection Group's most highly compensated employee. [DSMF ¶ 21]. Kahn, who began working for ATC in early 2001, received his negotiated $3.00 per hour raise on November 10, 2001, which raised his pay to $28.00 per hour. Kahn's pay increased to $29.00 on June 8, 2003, and to $29.87 on June 5, 2004. [DSMF ¶ 22]. Plaintiff learned that Khan received a higher hourly wage in May 2002. Plaintiff spoke with a Human Resources employee and Goharioon about the pay difference, but at no time did Plaintiff ask Goharioon for a raise. [DSMF ¶ 23].

AO 72A
(Rev.8/82)

At some point, Plaintiff and others at ATC began referring to Plaintiff as a "manager." [DSMF ¶ 24]. However, there is no evidence that Plaintiff's job title was ever officially changed to manager. [DSMF ¶ 25]. ATC managers were paid a salary and were ineligible for overtime. Plaintiff, however, continued to collect overtime over the course of his employment. [DSMF ¶ 26].

By August 2004, Plaintiff had begun detailed negotiations with his next employer, Metals & Materials Engineers. [DSMF ¶ 27]. A few weeks later, on September 11, 2004, Plaintiff emailed Wendell Lattz, ATC Regional Manager, and attached a formal complaint alleging discrimination by Goharioon. [DSMF ¶ 28]. According to Plaintiff's message, Human Resources was "not aware of this situation." [DSMF ¶ 29]. Plaintiff's attachment alleged discrimination by Goharioon with regard to Plaintiff's salary and his cubicle and with regard to Goharioon's general treatment of Plaintiff and other African American employees. [DSMF ¶ 30].

Immediately after receiving the letter, Lattz and Staci Landress, the company's Human Resources Manager, began investigating Plaintiff's complaint. [DSMF ¶ 31]. Each of them spoke with Plaintiff on several occasions, talked to Goharioon, and traveled to the Atlanta facility. [DSMF ¶ 32]. Lattz and Landress decided Goharioon could have managed the branch more effectively and counseled Goharioon about such

8

matters as allowing non-managers to perform supervisory tasks and making sure employees received their annual reviews. [DSMF ¶ 33]. Lattz also asked Goharioon to attend a two-day management skills seminar. [DSMF ¶ 34]. However, neither Lattz nor Landress found any evidence that Goharioon had engaged in discrimination. [DSMF ¶ 35]. Lattz stated in his declaration, "My investigation showed that [Plaintiff] was being referred to by different titles on different projects. Some clients were told Fred was a manager, while others were told he was a technician. . . . It appeared to me that the lack of clarity had caused Fred frustration and confusion." [Lattz Dec. ¶ 8].

On October 11, 2004, Lattz met with Goharioon and Plaintiff at the Atlanta office. [DSMF ¶ 36]. During the meeting, Goharioon and Plaintiff disagreed about whether Goharioon had managed the branch appropriately. [DSMF ¶ 37]. Goharioon offered to take steps to address Plaintiff's concerns, including calling Plaintiff a Department Manager. [DSMF ¶ 37]. However, Plaintiff told Lattz and Goharioon that he was not asking for a specific title, he just wanted them to clarify what his role was. [DSMF ¶ 38; Pla. Dec. ¶ 6]. Although Goharioon had believed Plaintiff's cubicle and rarely used laboratory were sufficient, shortly after the meeting, Goharioon offered Plaintiff an office with a door. [DSMF ¶ 39].

9

On October 20, 2004, at a meeting with Plaintiff and Branch Administrator Nancy Johnson, Goharioon presented Plaintiff with a job description. [DSMF ¶ 40]. Plaintiff agreed that the job description described the functions he was performing. [DSMF ¶ 41]. At the end of the meeting, Plaintiff indicated that he was satisfied with the description. [DSMF ¶ 42]. After the meeting, however, Plaintiff told Lattz and Landress that he felt the job description was a demotion since his title was listed as "NDE Level III Inspector" and not as a manager. [DSMF ¶ 43; Pla. Dep. at 191-204, Ex. 26].

On October 27, 2004, Lattz, Landress, Goharioon and Johnson met with Plaintiff at ATC. [DSMF ¶ 44]. During this meeting, Lattz offered Plaintiff the title of manager, a base salary that was 10% higher than Plaintiff's base pay rate, and eligibility for bonuses. [DSMF ¶ 45]. Lattz also proposed a change in reporting structure so that Plaintiff and the rest of the Structural Steel Inspection Group would report to someone other than Goharioon. [DSMF ¶ 46]. Plaintiff rejected ATC's offers of an office, a manager title, a salary increase and a change in reporting structure, and said he was going to resign. [DSMF ¶ 47]. At that point, Plaintiff revealed for the first time that he had filed a Charge with the Equal Employment Opportunity Commission ("EEOC"). [DSMF ¶ 48]. Plaintiff submitted his letter of

10

resignation on October 29, 2004, stating his resignation would be effective on November 12, 2004.  [DSMF ¶ 49].  Plaintiff began working for Metals & Materials Engineers on November 8, 2004.  [DSMF ¶ 50].

Additional facts will be set forth below as they become necessary for discussion of Plaintiff's claims.

## II.    Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986).

11

The movant bears the initial burden of asserting the basis of its motion, and that burden is a light one.  See Celotex, 477 U.S. at 323, 106 S. Ct. at 2553.  The movant is not required to negate its opponent's claim.  See id.  Rather, the movant may discharge this burden merely by "'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the non-moving party's case."  Id. at 325, 106 S. Ct. at 2554.  When this burden is met, the non-moving party is then required to "go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(e)).

While the evidence and factual inferences are to be viewed in a light most favorable to the non-moving party, see Rollins, 833 F.2d at 1529; Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir. 1987), that party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  The non-moving party must come forward with specific facts showing there is a genuine issue for trial.  See id. at 587.  An issue is not genuine if it is created by evidence that is "merely colorable" or is "not significantly probative."  Anderson, 477 U.S. at 249-50, 106 S. Ct. at 2511.  Accord Young v. General Foods

12

Corp., 840 F.2d 825, 828 (11th Cir. 1988).  Similarly, substantive law will identify which facts are material.  See Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.  Thus, to survive a motion for summary judgment, the non-moving party must come forward with specific evidence of every element essential to its case, so as to create a genuine issue for trial.  See Celotex, 477 U.S. at 323, 106 S. Ct. at 2553; Rollins, 833 F.2d at 1528.

## III.  Discussion

Plaintiff Frederick Williams alleges that Defendant ATC discriminated against him on the basis of his race and retaliated against him in violation of 42 U.S.C. § 1981 and Title VII.  [Doc. 1].  Plaintiff also asserts state law claims of intentional infliction of emotional distress and negligent hiring, training, retention and supervision.  [Id.].  Defendant ATC argues that summary judgment is warranted on all of Plaintiff's claims.  [Doc. 49].

### A.    Race Discrimination Claims

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ."  42 U.S.C. § 2000e-2(a)(1). Forty-two U.S.C. § 1981 also prohibits discrimination on the basis of race, and reads,

in pertinent part: "All persons . . . shall have the same right in every State . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws . . . as is enjoyed by white citizens. . . ." 42 U.S.C. § 1981(a). Plaintiff seeks to use § 1981 as a parallel basis for relief with his Title VII claim. [Doc. 1]. The elements required to establish a § 1981 claim mirror those required for a Title VII claim. Therefore, this court will "explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well." Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

In a circumstantial evidence case, such as that herein, the allocation of burdens and order of presentation of proof are as follows: (1) the plaintiff has the burden of proving a *prima facie* case of racial discrimination by a preponderance of the evidence; (2) if the plaintiff proves the *prima facie* case, the court will presume discriminatory intent, and the burden (of production) then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the action taken against the employee; and (3) if the defendant carries this burden, the presumption of discrimination is eliminated, and the plaintiff has an opportunity to prove by a preponderance of the evidence that the legitimate reason offered by the defendant was a pretext for discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804, 93 S. Ct. 1817, 1824-25,

14

36 L. Ed. 2d 668 (1973); <u>Carter v. Three Springs Residential Treatment</u>, 132 F.3d 635, 642-643 (11th Cir. 1998).

Plaintiff Williams contends that "he suffered loss of pay," was denied an office, and was demoted from his position as a manager on the basis of his race, African American.  [Doc. 60 at 5-7].  Plaintiff first alleges that racial discrimination can be established because he was paid lower wages than one other employee in the Structural Steel Inspection Group, Yousuf Khan.  [Doc. 60 at 5-6].  To survive summary judgment, Plaintiff must offer some evidence which would allow a jury to conclude that Defendant intended to discriminate against him in setting his wage based on his race.  <u>Ledbetter v. Goodyear Tire and Rubber Co., Inc.</u>, 421 F.3d 1169, 1185 (11th Cir. 2005); <u>EEOC v. Reichhold Chemical, Inc.</u>, 988 F.2d 1564, 1570 (11th Cir. 1993). Plaintiff can establish a *prima facie* case of wage discrimination by demonstrating that he occupied a job similar to higher paying jobs occupied by employees of a different race.  <u>Ledbetter</u>, 421 F.3d at 1185; <u>Mulhull v. Advance Security, Inc.</u>, 19 F.3d 586, 597 (11th Cir. 1994); <u>Miranda v. B & B Cash Grocery Store, Inc.</u>, 975 F.2d 1518 (11th Cir. 1992).

There is no question that Plaintiff, who is African American, and Yousuf Khan, who is Pakistani American, were similarly situated employees.  Both of the men

worked for ATC in the Structural Steel Inspection Group as NDE Engineers, and both were supervised by Alex Goharioon.  [DSMF ¶¶ 1, 14-17; PSMF ¶¶ 5, 6, 16]. However, as Defendant ATC correctly points out, "During part of the time Mr. Khan was employed by ATC, he earned less than Plaintiff, and during other times he earned slightly more." [Doc. 70 at 3].  Plaintiff began working for ATC in November of 2000, and his starting salary was $26.00 per hour.  [PSMF ¶ 6].  Plaintiff's salary remained $26.00 per hour from November 2000 until January 2002, at which time his pay was raised to $27.04 per hour.  [DSMF ¶ 20].  Kahn began working for Defendant ATC in March 2001 and was paid $25.00 per hour until November 2001.[4]  [DSMF ¶ 22]. Thus, for approximately eight months in 2001, Plaintiff was paid $1.00 more per hour than Khan.  Khan's pay was raised to $28.00 per hour in November 2001, to $29.00 in June 2003, and to $29.87 in June 2004.  [DSMF ¶ 22].  Plaintiff also received pay increases in June 2003 and June 2004.  [DSMF ¶ 20].

In summary, Khan was paid approximately $1.00 more per hour than Plaintiff from November 2001 until Plaintiff's resignation in November 2004, a period of

---

[4]Before accepting the position, Kahn asked to be paid $28.00 per hour and to be supervised by Goharioon.  [DSMF ¶ 15].  Goharioon believed $28.00 per hour to be too high, but he told Kahn that he would start him at $25.00 per hour and give him a $3.00 raise if Kahn obtained his Certified Welding Inspector certificate.  [DSMF ¶ 16].

16

approximately three years.  However, Plaintiff and Khan each received three pay raises from 2001 through 2004.  And during most of 2001, Plaintiff was paid more than Khan.  Given these facts, and Plaintiff's failure to offer any other evidence of racial discrimination, the court finds that  no reasonable jury could conclude that Defendant ATC subjected Plaintiff to discrimination on the basis of his race with regard to his pay.  Because Plaintiff cannot establish a *prima facie* case of race discrimination, Defendant's summary judgment motion [Doc. 49] is **GRANTED** on this part of Plaintiff's Title VII and § 1981 claim.

Plaintiff Williams next claims that he was denied an office and was demoted from his position as a manager on the basis of his race.  [Doc. 60 at 5-7].  A plaintiff can make out a *prima facie* case of racially disparate treatment by proving: (1) that he was within a protected racial class; (2) that he suffered an adverse employment action; and (3) that a similarly situated employee not within his protected class was not subjected to the adverse employment action.  See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 258, 101 S. Ct. 1089, 1096, 67 L. Ed. 2d 207 (1981); Krieg v. Paul Revere Life Ins. Co., 718 F.2d 998, 999 (11th Cir.1983).  Plaintiff Williams is able to establish the first *prima facie* element because he is in a protected racial class, African American.  Defendant contends, however, that Plaintiff cannot establish the

17

second element because he is unable to show that he was subjected to an adverse employment action.

To be actionable, an alleged discriminatory action must be both subjectively and objectively adverse.  See Gupta v. Florida Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000); Doe v. DeKalb County School District, 145 F.3d 1441 (11th Cir. 1998) (adopting an objective test to determine if an employment action is adverse). Moreover, the adversity must be material; that is, it must be more than "some de minimis inconvenience or alteration of responsibilities."  DeKalb County School District, 145 F.3d at 1453.  Accordingly, "[a]n action must 'show a serious and material change in the terms, conditions, or privileges of employment' for it to constitute an adverse employment action."  Ashmore v. J.P. Thayer Co., 303 F. Supp. 2d 1359, 1373 (M.D. Ga. 2004) (quoting Davis v. Town of Lake Park, Florida, 245 F.3d 1232, 1239 (11th Cir. 2001)).  As the Eleventh Circuit has pointed out, "'[N]ot everything that makes an employee unhappy is an actionable adverse action.'"  DeKalb County School District, 145 F.3d at 1449 (quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)).  Otherwise, "'every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'"  Id. (quoting Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir.

18

1996)).   The Eleventh Circuit has held that materially adverse actions "include discharges, demotions, refusals to hire or promote, and reprimands." <u>Akins v. Fulton County, Georgia</u>, 420 F.3d 1293, 1300 (11th Cir. 2005).

Plaintiff Williams argues that Goharioon's decision to deny him an office constituted an adverse employment action.  At some point during his employment with ATC, Plaintiff asked Goharioon to move him to an office with a door, but this request was denied.  [PSMF ¶ 27].  The problem with Plaintiff's claim is that this decision was no more than a trivial inconvenience for Plaintiff.  It certainly did not amount to "a serious and material change in the terms, conditions, or privileges of employment." <u>Davis</u>, 245 F.3d at 1239.  The court also notes that Plaintiff had his own cubicle and worked from this cubicle during his entire employment with ATC.  [DSMF ¶ 7].  Thus, the essence of Plaintiff's argument is that a jury could find that working in a cubicle constitutes a material adversity, which is obviously a meritless claim.  Even if Plaintiff's cubicle had been taken from him, the court would not find that an adverse action had occurred.  <u>See</u> <u>Place v. Abbott Lab.</u>, 215 F.3d 803, 810 (7th Cir. 2000) (holding that the loss of a telephone and cubicle were "too trivial to amount to an adverse employment action").

Plaintiff next contends that he was demoted and that this action constituted an adverse action. Plaintiff alleges that "he suffered loss of pay, benefits, title, and managerial authority." [Doc. 60 at 5]. Plaintiff was hired by Defendant ATC as a Level III NDE Inspector in the Structural Steel Inspection Group. [PSMF ¶ 5; DSMF ¶ 1]. Sometime after starting his employment with Defendant, Plaintiff Williams became the supervisor of the group. [PSMF ¶ 10]. Plaintiff had supervisory authority over most employees in the group, and Goharioon himself considered Plaintiff the head of the group. [PSMF ¶ 12]. The evidence reveals that Plaintiff liked to be called a manager, the company printed business cards for Plaintiff with the title NDT manager, and Plaintiff and others at ATC began referring to Plaintiff as a manager. [PSMF ¶ 14; DSMF ¶ 24; Goharioon Dep. at 50]. Goharioon testified, "[H]e wanted to use the NDT manager title, and it was loosely used. So, I did not have a problem with that, so he used the title." [Goharioon Dep. at 50]. Regional Manager Wendell Lattz confirmed that titles were used loosely in ATC's Atlanta Branch: "My investigation showed that [Plaintiff] was being referred to by different titles on different projects. Some clients were told Fred was a manager, while others were told he was a technician. . . . It appeared to me that the lack of clarity had caused Fred frustration and confusion." [Lattz Dec. ¶ 8].

20

Plaintiff contends that he was demoted from manager to NDE Level III Inspector on October 20, 2004, at a meeting involving Plaintiff, Branch Administrator Nancy Johnson, and Goharioon.  [Pla. Dep. at 191-204].  At that time, Goharioon presented Plaintiff with a job description, and Plaintiff agreed that the job description described the functions he was performing.  Plaintiff also indicated that he was satisfied with the description.  [DSMF ¶¶ 40-42].  After the meeting, however, Plaintiff told Lattz and Human Resources Manager Staci Landress that he felt the job description was a demotion since his title was listed as "NDE Level III Inspector" and not manager. [DSMF ¶ 43; Pla. Dep. at 191-204, Ex. 26].

The court finds that Plaintiff Williams has failed to offer evidence which would allow a reasonable jury to conclude that he was demoted.  The most notable deficiency in Plaintiff's argument is that he has offered nothing which shows that he was ever promoted to a position as manager.  Plaintiff was hired as a Level III NDE Inspector. There is no record of a promotion or a pay raise corresponding with a promotion. Moreover, Plaintiff agreed that the job description issued on October 20, 2004, which was for a Level III NDE Inspector, described the functions he was performing.  [DSMF ¶¶ 40-42; Pla. Dep. at 191-204, Ex. 26].  Plaintiff obtained supervisory responsibilities over the Structural Steel Inspection Group shortly after he was hired and was referred

21

to as a manager, apparently after he expressed that he liked the title.  But ATC managers were paid a salary and were ineligible for overtime, while Plaintiff continued to collect overtime over the course of his employment.  [DSMF ¶ 26].  Plaintiff has offered no evidence that he ever held any position at ATC other than that of Level III NDE Inspector.  In addition, neither his pay nor his responsibilities in this role were ever reduced.  Plaintiff is unable to show that he suffered a demotion.

While Plaintiff Williams claims that Defendant ATC subjected him to race discrimination by denying him an office and allegedly demoting him, he is unable to show that he suffered an adverse employment action.  Plaintiff, therefore, cannot establish a *prima facie* case of race discrimination, and Defendant's summary judgment motion [Doc. 49] is **GRANTED** on these parts of Plaintiff's Title VII and § 1981 race discrimination claims.

## B.    Retaliation Claims

Plaintiff Williams next claims that Defendant ATC violated Title VII and § 1981 by retaliating against him after he sent a formal complaint to the company alleging discrimination on September 11, 2004.  [DSMF ¶¶ 28-30].  Title VII acts to shield employees from retaliation for certain protected practices.  Specifically, the statute provides, in pertinent part:

22

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).   "Title VII's prohibition against discharge and adverse employment actions in retaliation for protected activity applies to claims brought under § 1981." Carr v. Stillwaters Development Co., L.P., 83 F. Supp. 2d 1269, 1277 (M.D. Ala. 1999).   Under the McDonnell Douglas framework, which applies to retaliation cases, the burden of production is initially on the plaintiff, who must establish a *prima facie* case of retaliation by a preponderance of the evidence.   See Holifield v. Reno, 115 F.3d 1555, 1566 (11th Cir. 1997); Robinson v. AFA Service Corp., 870 F. Supp. 1077, 1083 (N.D. Ga. 1994).   To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression.   Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002); Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1454 (11th Cir. 1998).

The parties agree that Plaintiff Williams is able to establish the first *prima facie* element.   Plaintiff engaged in protected activity when he sent a complaint of

23

discrimination to ATC management on September 11, 2004.  [DSMF ¶¶ 28-30].  The

parties disagree, however, over whether Plaintiff can establish that he was subjected

to an adverse employment action following his complaint.  Plaintiff alleges that he was

demoted, "was forced to quit his employment," and that "Defendant began to modify

his ability to manage the Structured Steel Inspection Group."  [Doc. 60 at 16].  The

court finds that the actions about which Plaintiff complains do not constitute adverse

employment actions.

As discussed *supra*, Plaintiff Williams was never demoted.  Plaintiff was hired

by ATC as a Level III NDE Inspector in the Structured Steel Inspection Group, and he

remained in that position until he resigned.  With regard to Plaintiff's claim that he was

"forced to quit" and that Defendant modified his ability to manage the group in

retaliation for his September complaint, Plaintiff has offered nothing which shows that

Defendant took any adverse actions against him following his September complaint of

discrimination.  The company did not take away any of his responsibilities, and it

clearly did not "force him to quit."  In fact, the evidence actually reveals that ATC took

significant steps to make Plaintiff happy and keep him employed.  On October 27,

2004, shortly before Plaintiff resigned, Regional Manager Wendell Lattz, Human

Resources Manager Staci Landress, Branch Manager Alex Goharioon and Branch

Administrator Nancy Johnson met with Plaintiff at ATC.  [DSMF ¶ 44].  During this meeting, Lattz offered Plaintiff the title of manager, a base salary that was 10% higher than Plaintiff's base pay rate, and eligibility for bonuses.  [DSMF ¶ 45].  Lattz also proposed a change in reporting structure so that Plaintiff and the rest of the Structural Steel Inspection Group would report to someone other than Goharioon.  [DSMF ¶ 46].  Plaintiff rejected ATC's offers of an office, a manager title, a salary increase and a change in reporting structure, and said he was going to resign.  [DSMF ¶ 47].  Plaintiff submitted his letter of resignation two days later, on October 29, 2004.  [DSMF ¶ 49].

No reasonable jury could conclude that Defendant ATC took any adverse employment actions against Plaintiff after he complained about discrimination on September 11, 2004.  Plaintiff, therefore, is unable to establish a *prima facie* case of retaliation, and Defendant's summary judgment motion [Doc. 49] is **GRANTED** on Plaintiff's Title VII and § 1981 retaliation claim.

### C.    State Law Claims

Plaintiff Williams' final claims are for intentional infliction of emotional distress and negligent hiring, training, retention and supervision, based on Georgia state law. [Doc. 1].  Under Georgia law, "'[a] cause of action for negligence against an employer

25

may be stated if the employer, in the exercise of reasonable care, should have known of an employee's reputation for sexual [or racial] harassment and that it was foreseeable that the employee would engage in sexual [or racial] harassment of a fellow employee but he was continued in his employment.'" Coleman v. Housing Authority of Americus, 191 Ga. App. 166, 170, 381 S.E.2d 303, 307 (1989) (citation omitted). "[T]he central issue in these cases often is whether the employer knew or had reason to know that the employee was engaged in harassing behavior." Pospicil v. Buying Office, Inc., 71 F. Supp. 2d 1346, 1360 (N.D. Ga. 1999).

In the present case, there is no evidence that Alex Goharioon ever engaged in any sort of behavior that a reasonable jury could find harassing or discriminatory. And there is clearly no evidence that Defendant ATC knew or had reason to know that Goharioon would engage in harassing or discriminatory behavior. Plaintiff apparently agrees as he has not responded to Defendant's summary judgment motion on this issue. [Doc. 60; Doc. 70 at 13]. Because Plaintiff has failed to come forward with evidence creating a genuine issue for trial, Defendant ATC's summary judgment motion [Doc. 49] is **GRANTED** on Plaintiff's state law negligence claim.

Plaintiff alleges that Defendant subjected him to intentional infliction of emotional distress and argues that the "same conduct . . . that forms the basis for Mr.

26

Williams's Title VII cause of actions equally supports" this claim.  [Doc. 60 at 17].

To state a claim for intentional infliction of emotional distress under Georgia law, the

plaintiff must show that the conduct was intentional or reckless; that the conduct was

extreme and outrageous; that there is a causal connection between the conduct and the

emotional distress; and that the emotional distress is severe.  See Gaston v. Southern

Bell Tel. & Tel. Co., 674 F. Supp. 347, 352 (N.D. Ga. 1987).  A claim for intentional

infliction of emotional distress requires more than an allegation that a plaintiff was

offended or insulted.  See Kornegay v. Mundy, 190 Ga. App. 433, 435, 379 S.E.2d 14,

16 (1989).  In fact, the burden on plaintiff is "a stringent one."  Ingram v. JIK Realty

Co., 199 Ga. App. 335, 404 S.E.2d 802 (1991).  The conduct must "go beyond all

possible bounds of decency, [so as to be] regarded as atrocious, and utterly intolerable

in a civilized community."  Norfolk S. Ry. v. Spence, 210 Ga. App. 284, 285, 435

S.E.2d 680, 681 (1993).  Whether a claim is sufficiently severe is a question of law.

See Johnson v. Savannah College of Art & Design, Inc., 218 Ga. App. 66, 67, 460

S.E.2d 308, 309 (1995).

Plaintiff's assertion that he was subjected to intentional infliction of emotional

distress lacks merit.  Plaintiff complains about the fact that Defendant ATC provided

him with a cubicle instead of an office, paid a co-worker $1.00 more than Plaintiff

AO 72A

(Rev.8/82)

during part of his employment, and gave Plaintiff a job description which accurately

described his position but did not include the word "manager." These actions are, at

most, minor workplace annoyances. Moreover, after Plaintiff complained to Defendant

about these issues, ATC offered Plaintiff an office, a manager title, a salary increase

and a change in reporting structure. Plaintiff, however, rejected all these offers and

responded by resigning. [DSMF ¶ 47]. Nothing alleged by Plaintiff even approaches

being "beyond all possible bounds of decency" or "of the sort which would arouse the

resentment of an average member of the community and cause him to exclaim,

'Outrageous!'" Savannah College of Art & Design, Inc., 218 Ga. App. at 67, 460

S.E.2d at 309. Therefore, Defendant's summary judgment motion [Doc. 49] is

**GRANTED** on Plaintiff's state law claim of intentional infliction of emotional

distress.

## IV.  Conclusion

For all the foregoing reasons and cited authority, the undersigned **ORDERS** that Defendant ATC's summary judgment motion [Doc. 49] be **GRANTED** on all of Plaintiff Williams' claims.

**SO ORDERED**, this 30th day of OCTOBER, 2006.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A

(Rev.8/82)